CHARLES R. IRVING & another *vs.* GARDINER H. SHAW & others.

Suffolk.    December 5, 1913. — June 19, 1914.

Present: RUGG, C. J., LORING, BRALEY, & DE COURCY, JJ.

*Equity Jurisdiction,* To reach property conveyed with intent to hinder, delay and defraud creditors.

On an appeal from a decree dismissing a bill in equity against a debtor of the plaintiff, the debtor's wife and a purchaser of a certain hotel property to reach and apply in satisfaction of the debt owed to the plaintiff certain notes alleged to have been given by the purchaser to the debtor's wife in purchase of an equity in the hotel property which the debtor was alleged to have conveyed to his wife with intent to hinder, delay and defraud his creditors, it appeared that, on evidence not reported, a master found that at the time when the equity was conveyed by the debtor to his wife he was amply solvent and had just undertaken the management of the property, which had been unsuccessful, to make it a paying investment, and that he made the conveyance for the purpose of providing his wife and children (who were living apart from him) with a source of income sufficient for their maintenance, that in a transfer to her a few months

later of a mortgage upon the property and in a foreclosure of the mortgage for her benefit, he acted with the purpose of continuing the investment for the same reasons, that three years and a half later, after the hotel property had proved unsuccessful and the debtor had been insolvent for a little more than half a year, the debtor advised and negotiated a sale of the property to the purchaser at a private sale for a price greater than would have been realized if a forced sale by holders of mortgages had been permitted, that at that time the value of the property had not been increased by expenditures made by the debtor after he became insolvent, and that in all his transactions with regard to the property the debtor at no time acted or caused any action to be taken for the purpose or with the actual intention of hindering or delaying the plaintiff in the collection of his debt. There was no finding by the master that the advance price procured by the sale was caused, apart from the debtor's services, by expenditures made by him while insolvent. *Held,* that the decree dismissing the bill should be affirmed.

BILL IN EQUITY, filed in the Superior Court on October 20, 1911, and afterwards amended, against Gardiner H. Shaw, his wife, Anna A. Shaw, Mina E. Fritz and the International Trust Company, to reach and apply in satisfaction of a debt owed to the plaintiffs by the defendant Gardiner H. Shaw, certain notes given by the defendant Fritz in the purchase of the Hotel Carlton property in Boston from the defendant Anna A. Shaw, to whom Gardiner H. Shaw was alleged to have conveyed an equity in the real estate with intent to hinder, delay and defraud his creditors, and from a corporation which practically was Gardiner H. Shaw, one of the notes having been placed by Anna A. Shaw in the possession of the International Trust Company.

The suit was referred to Arthur P. Hardy, Esquire, as master. The substance of the facts found by him in a first report and a supplemental report is stated in the opinion.

Exceptions to the report were overruled by *Hardy,* J., the report was confirmed, and a decree was entered establishing a debt due from the defendant Gardiner H. Shaw to the plaintiffs and ordering him to pay it, and dismissing the bill with costs as to the other defendants. The plaintiffs appealed.

*W. B. Grant,* for the plaintiffs.

*J. W. Spring,* (*E. H. Abbot, Jr.,* with him,) for the defendant Anna A. Shaw.

*H. T. Richardson,* for the defendants Gardiner H. Shaw and Mina E. Fritz, submitted their case without argument or brief.

LORING, J. The facts found by the master in his original and supplementary reports are substantially as follows.

In March, 1906, the trustees of a building called the Hotel Carlton applied to the defendant Shaw for assistance in extricating the property from the financial embarrassments into which it had fallen. At this time there was outstanding against the property common stock of the Carlton Hotel Trust (the amount of which is not stated) preferred stock of that trust to the amount of $150,-000; a floating debt amounting "approximately" to $25,000; a second mortgage for $150,000 (to the International Trust Company as trustee), and a first mortgage of $275,000 (to the Old Colony Trust Company as trustee).

Shaw had been the promoter of the enterprise when the Hotel Carlton was built in 1901–1903, but at the time in question (March, 1906), he had no interest, direct or indirect, in it or in its business. At this time (March, 1906), a Mr. Wadsworth owned "the greater part" of the preferred stock and "eighteen twenty-fifths" of the floating debt. It seems to have been assumed that the Old Colony Trust Company mortgage was good, that it was Mr. Wadsworth's interests in the trust which were in jeopardy, and that Shaw's aid was sought by the trustees to save (if possible) Mr. Wadsworth's interests. The mortgage to the International Trust Company was discharged in the following June (June, 1906), seemingly without any payment being made. We infer that it never became operative by the negotiation of bonds under it, and we lay that on one side.

Shaw agreed to take hold of the enterprise. He immediately advanced to the trustees $2,500 or $3,000, and later on $4,500 more, making his advances in all $7,000 or $7,500. He also agreed to advance $8,624.14, which the holders of the floating debt had agreed to accept in discharge of the $25,000 due them.

In the following June (June, 1906), the trustees executed to Mrs. Shaw a mortgage for $25,000. The master found that: "The consideration for the mortgage was the money which Gardiner H. Shaw loaned to the Trustees; the obligation which he assumed of paying the bondholders [evidently a mistake for note-holders], and the services which he agreed to render in an attempt to put the property upon a paying basis, which would ultimately redound to the benefit of the preferred stockholders and Mrs. Shaw." At this time the defendant Shaw and his wife were living apart, the separation having taken place some ten months

earlier. They had two children, who remained with Mrs. Shaw. She had no property of her own. The master found as a fact "that it was his [Shaw's] intention in having the $25,000 mortgage run to Mrs. Shaw, to provide her with a source of income which he then thought would be sufficient to maintain her and the children."

The $25,000 mortgage was assigned by Mrs. Shaw to Mr. Wadsworth as security for the payment of the $8,624.14, which was to be paid in satisfaction of the floating debt of $25,000. Upon the payment of that sum it (the $25,000 mortgage) was to be reassigned to Mrs. Shaw.

There was a collateral oral agreement between Shaw and Mr. Wadsworth, by which Mr. Wadsworth, who owned eighteen twenty-fifths of the floating debt, agreed to accept Shaw's services in reinstating the financial condition of the property in payment of his (Wadsworth's) share of the $8,624.14, to be paid in retiring that debt.

In the following September Mr. Wadsworth died, and his successor, Mr. Eliot Wadsworth, refused to abide by this oral collateral undertaking. This brought about a new situation. The new situation was met by the foreclosure of the $25,000 mortgage to Mrs. Shaw, the buying in of the property by a third person in the interest of Mrs. Shaw, and the making of a new mortgage to Eliot Wadsworth conditioned in substance upon the payment of the $8,624.14, and subject to that and to the first mortgage to the Old Colony Trust Company, the property was conveyed to Mrs. Shaw. This took place in November, 1906.

About two months before the foreclosure (that is, in September, 1906), Shaw had proceeded to make radical changes in the hotel and in its management. Up to this time it had been run as an apartment house, "only a portion" of the rooms being furnished by the hotel. Shaw determined to develop the transient business, and later on he changed over a part of the premises so as to adapt them for use as an automobile club. At this time also (that is, in September, 1906), Shaw took over the control and management of the hotel and kept it, at first in his own name and later in the name of an incorporated company which was nothing more than Shaw himself, until the property was sold to a Miss Fritz, in July, 1910, as will be hereinafter stated at length.

After the title to the property became vested in Mrs. Shaw, in November, 1906, Shaw paid her $200 a month as rent in addition to paying the mortgage interest and taxes. Later, when she came to live in the hotel, the $200 a month was reduced to $100. This continued until the sale to Miss Fritz already referred to.

When June, 1907, came, the money for paying the noteholders had not been earned by the hotel nor otherwise provided for by Shaw, and another change in the situation ensued. To enable him to raise the money necessary to pay off the holders of the floating debt and to provide money for carrying out his plans with respect to the hotel, Shaw caused the mortgage to Mrs. Shaw to be discharged and a new mortgage for $25,000 to be made to the International Trust Company to secure twenty-five bonds of $1,000 each. By a pledge of these bonds Shaw raised $17,000 or $18,000, —the amount is stated differently in different parts of the report. Of this $17,000 or $18,000, $8,624.14 was used in retiring the floating debt, and the balance, "approximately $10,000," was used by Shaw, with the consent of his wife, in "remodeling the first floor, fixing the foundations and making other. improvements, such as the construction of a new entrance, a new large dining room, a bar, and other alterations which were of a permanent character." These improvements were not completed until some time in 1909.

In addition to this, "between October, 1906, and the latter part of 1907, he [Shaw] spent approximately twelve thousand dollars ($12,000) for furniture and furnishings; he paid off a mortgage that was on the furniture when he took over the business; he paid back taxes and insurance amounting to nearly six thousand dollars ($6,000), and he advanced money for the running of the business." By this time (the latter part of 1907) Shaw's "available cash" was used up and he had many claims outstanding against him. To prevent the running of the hotel from being interfered with by attachments in actions against him, Shaw caused a corporation to be formed, with a capital stock of $10,000 "issued largely for good will," and thereafter the hotel was run by that corporation until the sale to Miss Fritz in July, 1910.

In the latter part of 1907 Shaw became embarrassed and was unable to pay his debts as they matured in the usual course of business, but he was not then insolvent. "In the latter part of

1909 or the early part of 1910, he was without financial resources,"
as the master stated the fact, that is to say, he was insolvent. In
October, 1909, Shaw borrowed upon a mortgage of the furniture
of the hotel $6,000. Apparently he used $1,000 of this for
purposes not stated, and the other $5,000 he lent to the corpora-
tion to enable it to continue operating the hotel.

In July, 1910, a written agreement was made for the sale of the
real estate subject (1) to the first mortgage to the Old Colony
Trust Company for $275,000, and (2) to the second mortgage
for $25,000 and for the sale of the personal property subject to
various encumbrances; and this agreement subsequently was
carried into effect. As we understand the report some $14,000
was paid in cash and eight notes for $5,000 each were given by
the purchaser for the balance of the purchase money due under
the agreement. The purchaser assumed the payment of the first
and second mortgages on the real estate, and gave a third mort-
gage to secure her eight notes of $5,000 each.

It is stated in the master's supplementary report that Shaw
became indebted to the plaintiffs in the sum of $2,296.40; to
one MacDonald and Joslyn of $2,351; and to the H. Newton
Marshall Co. of $796.69, making a total of $5,444.09, for work
and materials furnished by them to him in connection with the
Hotel Carlton. It was stated at the argument that the present
was one of three suits which were tried together before the master
(the master's report being in each case substantially of the same
effect except as to the amounts due the respective plaintiffs),
and that this suit was brought to this court under an arrangement
by which the other two suits awaited the decision in this.

The bill here in question was brought by these plaintiffs against
Shaw and his wife and Miss Fritz, the purchaser, and the In-
ternational Trust Company (trustee of the $25,000 mortgage).
The bill proceeded on the ground that the title to the hotel had
been put by Shaw in the name of his wife, in November, 1906,
to hinder and defraud his creditors. It was alleged that he had
no property other than the hotel, and that his wife had none, and
the plaintiffs sought to reach and apply the eight notes for $5,000
each given by Miss Fritz in payment for the hotel, as property
of Shaw which had been fraudulently put in the name of his wife.

The master found, however, against this contention. He found

that when Shaw took hold of the Hotel Carlton he was worth from $15,000 to $20,000. He also found that in securing the mortgage to Mrs. Shaw for $25,000 (in June, 1906) "it was his [Shaw's] intention . . . to provide her [Mrs. Shaw] with a source of income which he then thought would be sufficient to maintain her and the children;" that in foreclosing the mortgage and having the title conveyed to Mrs. Shaw in November, 1906, "it was his [Shaw's] purpose and intention to continue the investment for the benefit of Mrs. Shaw and their children;" and that "on account of the lack of success in running the hotel, Mr. Shaw in July, 1910, advised and negotiated the sale of the property and business to the respondent Fritz." The master ended his original report with these words: "I find that at no time did Mr. Shaw do any act or cause any action to be taken in relation to the Hotel Carlton property, whether it be in June, 1906, when he made the original investment, or in October, 1906, when he caused the mortgage to be foreclosed, or in November, 1906, when the equity was transferred to Mrs. Shaw, or in July, 1910, when the notes and $40,000 mortgage were issued to Mrs. Shaw, for the purpose or with the actual intention of hindering or delaying the complainants in the collection of their account."

After the coming in of the master's report the bill was amended, and the cause was recommitted to the master to report his findings on nine interrogatories there specified. The first of these was to state at what time after November 12, 1906, Shaw became unable to pay his debts as they matured in the usual course of business; and the second was: "Was any part of the value of the equity of the real estate called Hotel Carlton, above the mortgages thereon, on July 15, 1910, due to money which the defendant, Shaw, had applied of his own assets or credits upon said real estate from and after the date when he was no longer otherwise able to pay the debts due to his creditors as they became payable, including those of the plaintiffs?"

The manifest purpose of these interrogatories, both those set forth above and the other seven, was to make out a case under the doctrine of *Lynde* v. *McGregor*, 13 Allen, 182.

By a subsequent order the master was authorized in his discretion to recall his former report for revision or to change the findings made by him in it. In his supplemental report the master

reviewed the findings made by him in his original report, and explained them.  But he did not change them.  He found (as we have said already) that while Shaw became embarrassed and was unable to pay his debts as they matured in the ordinary course of business in 1907, he did not become insolvent until the latter part of 1909 or the early part of 1910.

The master further found that "no part of the value of the equity of the real estate called Hotel Carlton, above the mortgage thereon, on July 15, 1910, was due to money which the defendant Shaw had applied of his own assets or credits upon said real estate from and after the date when he was no longer otherwise able to pay the debts due to his creditors as they became payable, including those of these plaintiffs."  He found that the fair market value of the Carlton was $350,000, and that from November, 1906, until the sale in 1910, there was little change in the value of the property.  The "appreciation in the value of the land was probably offset by the depreciation due to the increased age of the building."  The master, having found that there was no increase in the market value of the Carlton Hotel property, did not answer the interrogatories as to whether Shaw applied any of his own assets upon the real estate after the date when he could not meet his obligations as they matured in the regular course of business, or the further interrogatories as to how much of his assets were so applied.

In reviewing his former findings the master went more at length into the sale of the hotel furniture which belonged to Shaw. In his supplemental report he finds that Shaw sold and assigned the furniture to Miss Fritz on an agreement on her part to assume the outstanding liabilities, and that he did not receive anything from Miss Fritz for the furniture.  He further finds that the outstanding liabilities amounted to $14,537.50, and that the furniture was not worth more than that amount.

It is manifest that the master's report, unless reversed, is decisive against the bill, both on the ground on which it was originally brought and on the further ground that a case was made out under the doctrine of *Lynde* v. *McGregor, ubi supra,* by expenditures on the part of Shaw increasing the market value of the hotel, which expenditures were fraudulent as against Shaw's creditors. The evidence on which the master made the findings is not before

us, and there is nothing in the facts found by the master which shows that they were plainly wrong. The master's report, therefore, must stand.

At the argument before this court the plaintiffs advanced a new and third ground on which they seek to subject the eight notes for $5,000 to a lien in their favor as creditors of Shaw. That ground is that the money expended by Shaw, even if it did not increase the market value of the hotel, did enable Mrs. Shaw to sell the hotel to advantage, and (as we understand the argument) that the expenditures made by Shaw prevented the hotel from being sold at a forced sale; that the difference between a forced sale and the sale which was in fact made to Miss Fritz far exceeds in amount the debts which are due to the plaintiffs in this suit and in the other two suits already mentioned, amounting to $5,-444.09.

The difficulty, however, with this contention is that it never has been made in the pleadings nor tried out before the master. There is great reason for supposing that through the expenditures made by Shaw, or through his efforts, in keeping the hotel running, or through both, a forced sale of the property was avoided and a sale to a purchaser who wanted to buy was effected. The greater price derived from that sale over what would have been derived from a forced sale cannot be subjected to an equity in favor of Shaw's creditors unless the plaintiffs prove that this greater price was due to expenditures made by Shaw in fraud of his creditors. If the $5,000 which was lent to the corporation by Shaw in October, 1909 (when he was insolvent) had been expended on Mrs. Shaw's property in place of being lent to the corporation and if it had been found that that expenditure (apart from Shaw's services) had been the cause of the advantageous sale, it might be that an equity in favor of the plaintiffs on this new ground would have been made out. But the $5,000 was not expended on Mrs. Shaw's property. It was lent to the corporation. It may be that the advantageous sale was the result of the fact that the hotel had been kept in operation, but the continued operation of the hotel was on its face for Shaw's benefit and not for the benefit of his wife's property. On the findings of the master it cannot be taken to be the fact that Shaw's purpose in keeping the hotel running by and through the corporation was to prevent a forced

sale and bring about an advantageous one. We have spoken of the necessity of the further finding that this expenditure apart from Shaw's services was the cause of the advantageous sale because Shaw's creditors had no right to his services. It is apparent that on the facts found by the master an equity on the ground now urged has not been made out; and, further, that the facts necessary to support an equity on that ground (if an equity on that ground can be made out) would not be a fair inference from the facts found by the master.

The result is that the decree dismissing the bill must be affirmed, with costs, and it is

*So ordered.*